IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VERANIO S. TONGSON, JEFFREY JAVIER, KIM S. NEMOTO, ) ) ) | Civ. No. 05-00683 SOM/LEK |
| Plaintiff, ) ) | |
| vs. ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| COUNTY OF MAUI, DEPARTMENT OF HOUSING AND HUMAN CONCERNS; DIRECTOR ALICE LEE, IN HER OFFICIAL AND INDIVIDUAL CAPACITY; PROGRAM SPECIALIST WENDY STEBBINS, IN HER OFFICIAL AND INDIVIDUAL CAPACITY; JOHN DOES 1-20; DOE ENTITIES 1-20, ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

On April 4, 2006, Plaintiffs Veranio S. Tongson, Jr.

("Tongson"), Kim S. Nemoto ("Nemoto"), and Jeffrey Javier

("Javier") (collectively, "Plaintiffs") filed the First Amended

Complaint ("FAC") against Defendants County of Maui Department of

Housing and Human Concerns ("the County"), Alice Lee ("Lee"), and

Wendy Stebbins ("Stebbins").  In the FAC, Plaintiffs assert the

following claims:  (1) retaliation by the County and Lee (in her

official capacity only) in violation of the First Amendment of

the United States Constitution (Count 1);[1] (2) violation of the

---

[1] Count 3 of the FAC alleges a violation of 42 U.S.C.
§ 1983.  Because Plaintiffs' First Amendment claim is brought
pursuant to § 1983, the First Amendment claim (Count 1) and the

Hawaii Whistleblowers' Protection Act ("the HWPA"), Haw. Rev. Stat. § 378-62, by the County and Lee (in her official capacity only) (Count 2); and (3) intentional infliction of emotional distress ("IIED") by the County, Lee (in her official and individual capacities), and Stebbins (in her individual and official capacities) (Count 4).[2]  Tongson asserts the following additional claims:  (1) gender discrimination by the County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; (Count 5); (2) breach of implied contract by the County (Count 6); (3) defamation by Stebbins (in her official and individual capacities) (Count 7); and (4) retaliation by the County under Title VII and Haw. Rev. Stat. § 378-2 (Count 8).[3]

On September 27, 2006, Defendants filed two motions seeking summary judgment against Plaintiffs on all of their claims.  One defense motion concerned claims by Tongson ("Tongson MSJ"), the other claims by Nemoto and Javier ("Nemoto and Javier MSJ").  For the reasons discussed herein, the court grants in

---

§ 1983 claim (Count 3) are construed as one claim under Count 1.

[2] Only Tongson asserts an IIED claim against Stebbins. See Plaintiffs' First Supplement to Plaintiffs' Memorandum in Opposition ("Plaintiffs' First Supplement") at 3-4 (noting that Nemoto and Javier do not intend to assert IIED claims against Stebbins).

[3] Plaintiffs withdrew their retaliation claims under the Hawaii constitution.  See Plaintiffs' Second Supplement to Plaintiffs' Memorandum in Opposition at 2.  Tongson also withdrew his gender discrimination claim against the County under Haw. Rev. Stat. § 378-2.  See Plaintiffs' First Supplement at 4.

part and denies in part Defendants' motions.  The tables below
summarize this court's rulings as to each Plaintiff:

| Claims asserted by <u>Tongson</u>: | Defendant County | Defendant Lee, in her official capacity | Defendant Lee, in her individual capacity | Defendant Stebbins, in her official capacity | Defendant Stebbins, in her individual capacity |
|---|---|---|---|---|---|
| **Count 1: Retaliation under the First Amendment via 42 U.S.C. § 1983** | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004.<br><br>All claims based on allegedly retaliatory acts by Okubo, Andaya, and Lee. | Summary judgment granted. | N/A | N/A | N/A |

| Claims asserted by Tongson: | Defendant County | Defendant Lee, in her official capacity | Defendant Lee, in her individual capacity | Defendant Stebbins, in her official capacity | Defendant Stebbins, in her individual capacity |
|---|---|---|---|---|---|
| **Count 2: Retaliation under the HWPA** | Summary judgment granted in part, denied in part. Granted with respect to: All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004. All claims based on allegedly retaliatory acts by Okubo, Andaya, and Lee. | Summary judgment granted. | N/A | N/A | N/A |
| **Count 4: IIED** | Summary judgment granted in part, denied in part. Granted with respect to: All claims except those against the County that relate to violations of Haw. Rev. Stat. § 378-2 and are based on events occurring between October 27, 2003 and May 12, 2004. | Summary judgment granted. | Summary judgment denied. | Summary judgment granted. | Summary judgment denied. |

| Claims asserted by <u>Tongson</u>: | Defendant County | Defendant Lee, in her official capacity | Defendant Lee, in her individual capacity | Defendant Stebbins, in her official capacity | Defendant Stebbins, in her individual capacity |
|---|---|---|---|---|---|
| **Count 5: Gender Discrimina-tion under Title VII** | Summary judgment granted. | N/A | N/A | N/A | N/A |
| **Count 6: Breach of Implied Contract** | Summary judgment denied. | N/A | N/A | N/A | N/A |
| **Count 7: Defamation** | N/A | N/A | N/A | Summary judgment granted. | Summary judgment granted. |
| **Count 8: Retaliation under Title VII and Haw. Rev. Stat. § 378-2** | Summary judgment granted. | N/A | N/A | N/A | N/A |

| Claims asserted by Nemoto: | Defendant County | Defendant Lee, in her official capacity | Defendant Lee, in her individual capacity | Defendant Stebbins, in her official capacity | Defendant Stebbins, in her individual capacity |
|---|---|---|---|---|---|
| **Count 1: Retaliation under the First Amendment via 42 U.S.C. § 1983** | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004.<br><br>Some claims based on Nemoto's allegedly protected speech and Defendants' alleged acts, as discussed in this order. | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004.<br><br>Some claims based on Nemoto's allegedly protected speech and Defendants' alleged acts, as discussed in this order. | N/A | N/A | N/A |
| **Count 2: Retaliation under the HWPA** | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004. | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004. | N/A | N/A | N/A |
| **Count 4: IIED** | Summary judgment granted. | Summary judgment granted. | Summary judgment denied. | N/A | N/A |

| Claims asserted by _Javier_: | Defendant County | Defendant Lee, in her official capacity | Defendant Lee, in her individual capacity | Defendant Stebbins, in her official capacity | Defendant Stebbins, in her individual capacity |
|---|---|---|---|---|---|
| **Count 1: Retaliation under the First Amendment via 42 U.S.C. § 1983** | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004.<br><br>Some claims based on Defendants' alleged acts, as discussed in this order. | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004.<br><br>Some claims based on Defendants' alleged acts, as discussed in this order. | N/A | N/A | N/A |
| **Count 2: Retaliation under the HWPA** | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004. | Summary judgment granted in part, denied in part. Granted with respect to:<br><br>All claims based on allegedly retaliatory acts occurring before October 27, 2003, or after May 12, 2004. | N/A | N/A | N/A |
| **Count 4: IIED** | Summary judgment granted. | Summary judgment granted. | Summary judgment denied. | N/A | N/A |

7

II.      LEGAL STANDARD.

Summary judgment shall be granted when

> the pleadings, depositions, answers to
> interrogatories, and admissions on file,
> together with the affidavits, if any, show
> that there is no genuine issue as to any
> material fact and that the moving party is
> entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr.,
383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc.,
198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal
purposes of summary judgment is to identify and dispose of
factually unsupported claims and defenses.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that
fails to demonstrate facts to establish what will be an essential
element at trial.  See id. at 323.  A moving party without the
ultimate burden of persuasion at trial--usually, but not always,
the defendant--has both the initial burden of production and the
ultimate burden of persuasion on a motion for summary judgment.
Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102
(9th Cir. 2000).  The burden initially falls upon the moving
party to identify for the court "those portions of the materials
on file that it believes demonstrate the absence of any genuine
issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec.
Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing
Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter, 383 F.3d at 1024 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion."). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134 (citation omitted). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the

9

evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 338 F.3d at 1024.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.

The summary judgment burdens are properly applied to a motion asserting qualified immunity.  See Butler v. San Diego Dist. Attorney's Office, 370 F.3d 956, 958 (9th Cir. 2004) ("When a defendant makes a properly supported motion for summary judgment based on official immunity, the plaintiff has an obligation to produce evidence of his or her own.  In such a case, the district court is not required (or even allowed) simply to assume the truth of challenged factual allegations in the complaint.  In other words, a motion for summary judgment based on official immunity is governed by Federal Rule of Civil Procedure 56, just like all motions for summary judgment in civil suits in federal district court.").

III.    BACKGROUND FACTS.

A.    Facts Pertinent to Tongson.

In 2000, Tongson was transferred to the Grants Management Division of the County's Department of Housing and

Human Concerns ("the Department").  FAC ¶ 14; Ex. R (attached to Tongson MSJ) at 13.  Tongson was promoted to the position of Temporary Administrator, where he supervised four employees, including Stebbins.  FAC ¶¶ 14-15; Ex. R (attached to Tongson MSJ) at 20-21, 24.

Tongson says that, beginning in late 2002, he became aware of "fraud, conspiracy, corruption, and theft by Defendants."  Declaration of Veranio S. Tongson (11/9/2006) ("Tongson 11/9/2006 Decl'n") ¶ 11.  Tongson says that, "from 2004 up to August 18, 2004," he reported these matters to "Mayor Alan Arakawa, Councilman Joseph Pontanilla, Budget Director Danilo Agsalog, Defendant Lee, Deputy Director Herman Andaya, and Special Programs Coordinator Rudulpho Esquer."  Declaration of Veranio S. Tongson 11/29/2006 ("Tongson 11/29/2006 Decl'n") ¶ 21.  Tongson alleges that the County and Lee retaliated against him between August 2003 and October 2005 for speaking out about these issues by, among other things:  (1) excluding him from meetings and from "decision making"; (2) yelling at and threatening him; (3) demoting him; (4) placing him on administrative leave; and (5) transferring him to the Housing Division.  Tongson 11/9/2006 Decl'n ¶ 13; Tongson 11/29/2006 Decl'n ¶¶ 3-10.  Tongson says, "After being retaliated against for my protected speech, I was 'chilled' from disclosing . . . new violations I discovered in 2005, for fear of further reprisal against me."  Tongson 11/9/2006 Decl'n ¶ 13.

Tongson also alleges that he was falsely accused of sexual harassment by Stebbins in retaliation for speaking out. Tongson 11/9/2006 Decl'n ¶ 13(i).  Tongson first met Stebbins in 2000, when she worked for another division within the County, and she says he encouraged her to transfer to the Grants Management Division.  Declaration of Wendy Stebbins (9/22/2006) ("Stebbins Decl'n") ¶¶ 2, 5.  According to Stebbins, after she transferred to that division, Tongson began to touch her hands, shoulder, and back and complimented her appearance, wrote her a poem, and told her, "I love you."  Stebbins Decl'n ¶¶ 7-11, 13.  Stebbins says that Tongson's behavior made her uncomfortable, that he stopped acting that way when she asked him to, but that he would resume after a while.  Stebbins Decl'n ¶¶ 10-11.

On June 24, 2004, Stebbins says she told Tongson that "if he ever did anything inappropriate again, I would file a sexual harassment complaint."  Stebbins Decl'n ¶ 26.  On August 17, 2004, Stebbins says that Tongson touched her hand again. Stebbins Decl'n ¶ 27.  The next day, she informed Lee, the director of the Department, that she wanted to file a sexual harassment complaint against Tongson.  Stebbins Decl'n ¶ 29.  On August 24, 2004, Stebbins submitted her written sexual harassment complaint against Tongson to Lee.  Stebbins Decl'n ¶ 30.

In response to Stebbins's complaint, Lee sought legal advice from the Department of Corporation Counsel and the Department of Personnel Service.  Declaration of Alice L. Lee (9/20/2006) ("Lee Decl'n") ¶¶ 3-4.  Lee then placed Tongson on

12

administrative leave with pay and assigned Herman Andaya

("Andaya") to investigate the matter.  Lee Decl'n ¶¶ 4-7.  The

investigation concluded that Tongson had violated the County's

Sexual Harassment Policy, and Lee suspended Tongson for five days

without pay.  Lee Decl'n ¶¶ 15-16.

Tongson says that the County and Lee "engaged in gender

discrimination against [him]" by, among other things:

(1) placing him on administrative leave with pay while the County

investigated Stebbins's sexual harassment complaint; (2) refusing

to investigate his own sexual harassment complaint against

Stebbins; and (3) allowing Lee to investigate the matter.

Tongson 11/9/2006 Decl'n ¶ 23.  Tongson says the County also

breached its Sexual Harassment Policy by, among other things,

placing him on administrative leave "<u>before</u> he was allowed to

'hear and respond to accusations.'"  Tongson 11/9/2006 Decl'n

¶ 16(f) (emphasis in original).

On May 31, 2005, Tongson filed a complaint with the

Equal Employment Opportunity Commission ("EEOC") and the Hawaii

Civil Rights Commission ("HCRC"), claiming that the County had

retaliated and engaged in gender discrimination against him.  Ex.

X (attached to Tongson MSJ) at 1-7.  Tongson received a right-to-

sue letter dated August 4, 2005, from the EEOC.  On December 5,

2005, Tongson filed a second complaint against the County with

the EEOC and HCRC, alleging retaliation.  Ex. AA (attached to

Tongson MSJ) at 5.  Tongson received right-to-sue letters from

the EEOC and HCRC dated January 5, 2006, and January 6, 2006, respectively.

     B.   <u>Facts Pertinent to Nemoto.</u>

     On May 8, 2000, Nemoto was hired by the County as a Housing Specialist I and was assigned to the Housing Division. Declaration of Kim S. Nemoto (10/8/2006) ("Nemoto 10/8/2006 Decl'n") ¶ 38.  As a Housing Specialist I, Nemoto says she "served as a staff specialist for the Section 8 Housing Assistance Payments Certificate and Housing Voucher Programs, interviewed applicants to determine eligibility, performed rent computations, verified all data, prepared Housing Assistance Payments Contracts, provided information services, conducted special studies, [and] conducted inspections."  Nemoto 10/8/2006 Decl'n ¶ 39.

     Nemoto says that, beginning on April 8, 2003, she "engaged in protected speech on matters of public concern."  FAC ¶ 44.  She says she reported that:  (1) "Housing Specialists needed [the County's] Administrative Plan which details the law, rules, regulations, etc."; (2) thirty-five Housing Inspection reports "contained overdue failed items"; (3) the County "did not have a written policy on whose responsibility it was to: a) telephone the landlord or tenant about the status of the repairs for failed inspections, or b) to schedule the re-inspection follow-up"; (4) the County's "overpayments to landlords must be refunded"; and (5) "Tenant case files were not being secured and the Tenant information protected."  FAC ¶ 44.

Nemoto alleges that, in response to her statements, Defendants retaliated against her beginning in June 2004 by, among other things:  (1) falsely accusing her of taking unauthorized leave; (2) asking her "to stop audio recording the staff meetings"; (3) suggesting that she transfer to another division; and (4) "subjecting her to dangerous workplace [conditions]."  FAC ¶ 45.

C.  Facts Pertinent to Javier.

On January 2, 2003, Javier was hired by the County as a Housing Inspector.  FAC ¶ 28.  Javier says his job duties included:  (1) interpreting and enforcing the Department of Housing and Urban Development's Housing Quality Standards, (2) scheduling and conducting annual and periodic inspections "to ensure that the units are eligible to participate in the program"; (3) determining if proposed rents were reasonable and comparable to unassisted rental units in the community; and (4) monitoring the progress of repairs to properties.  FAC ¶ 30.

Javier says that, from the beginning of his employment with the County, he "was asked to do things that he knew were wrong, but did them anyway for fear of [losing] his job."  FAC ¶ 32.  Javier alleges that, beginning in 2004, he "engaged in protected speech on matters of public concern" by, among other things, reporting that:  (1) "the 3 Housing Inspectors did not have sufficient 'training' to perform the Section 8 rental inspections"; (2) "the 3 Housing Inspectors did not have sufficient 'written guidelines' to perform the Section 8 rental

inspections"; (3) inspectors "were unable to properly and completely inspect 8 houses on the island of Molokai in one day"; and (4) "the supervisors were passing his 'failed' inspections, without conducting reinspections, and just signing off on them." FAC ¶ 34.

Javier says that the County responded to his reports by retaliating against him beginning on June 2, 2004, by: (1) denying him pay for time spent traveling for work; (2) accusing him of submitting untimely inspection reports; (3) falsely accusing him of arriving for an inspection early; (4) assigning him the responsibilities of other employees; and (5) threatening him.  FAC ¶ 35.

IV.    ANALYSIS.

      A.   Defendants' Motion Regarding Tongson's Claims.

           1.   Lee's Qualified Immunity.

Lee argues that she is entitled to qualified immunity. Her entire argument on this issue is as follows:

> Lee, as a public official, is entitled to
> qualified immunity.  Qualified immunity
> protects officials from suits as long as
> their conduct does not violate clearly
> established statutory or constitutional
> rights of which a reasonable person would
> have known.  The doctrine provides broad
> protection, immunizing officials from their
> exercise of poor judgment, and only failing
> to protect those that are plainly incompetent
> or those who knowingly violate the law.

Tongson MSJ at 35-36.  As Lee points to no facts in the record and provides no analysis of the issue, she fails to meet her burden on this point.  See Houghton v. South, 965 F.2d 1532, 1536

(9th Cir. 1992) ("qualified immunity is an affirmative defense, and the burden of proving the defense lies with the official asserting it" (internal citations omitted)); T.W. Elec. Serv., 809 F.2d at 630.  The court therefore examines the merits of Tongson's claims against Lee.

> 2.   Count 1:  Retaliation Claims Under the
>      First Amendment.

Defendants seek summary judgment on Tongson's claims under the First Amendment, which are brought pursuant to 42 U.S.C. § 1983.  Defendants argue that the County is not liable under § 1983 and that Tongson "did not engage in protected speech, did not suffer any adverse action and there are legitimate reasons for the actions."  Tongson MSJ at 15, 30. Arguing that he did engage in protected speech and suffer adverse employment actions, Tongson claims there is a causal connection between his speech and Defendants' actions.  Tongson Opp. at 3-16.

> a.   Section 1983.

With respect to § 1983, Defendants first argue that "Tongson is unable to prove the necessary elements to impose liability upon the County pursuant to Monell v. New York City Dep't of Soc. Serv., 436 U.S. 658, 98 S. Ct. 2018, 56 L. E. 2d 611 (1977)."  Tongson MSJ at 30.  Because Defendants rest on this statement without referring the court to any evidence, they fail to meet their burden on this point.  See Nissan Fire & Marine Ins., 210 F.3d at 1102.

Defendants also contend, "Pursuant to HRS § 46-72, a county must be given written notice within six months after the injuries were received of any claim sounding in tort." Tongson MSJ at 31. Because claims under § 1983 are tort claims, Defendants assert that Tongson's § 1983 claims must be dismissed, as Tongson did not provide such notice to the county. Tongson MSJ at 31. The court agrees that some of Tongson's § 1983 claims are time-barred.

Counties are protected by Haw. Rev. Stat. § 46-72, which provides:

> Before the county shall be liable for damages
> to any person for injuries to person . . .
> received upon any . . . public places of the
> county, or on account of any negligence of
> any official or employee of the county, the
> person so injured . . . shall, within six
> months after the injuries are received, give
> the chairperson of the council of the county
> or the city clerk of Honolulu notice in
> writing of the injuries and the specific
> damages resulting, stating fully in the
> notice when, where, and how the injuries
> occurred, the extent thereof, and the amount
> claimed therefor.

In <u>Salavea v. City and County of Honolulu</u>, 55 Haw. 216, 221, 517 P.2d 51, 54-55 (Haw. 1973), the Hawaii Supreme Court held that Haw. Rev. Stat. § 662-4, the two-year statute of limitations governing tort claims against the State of Hawaii, "is the applicable statute of limitations [for tort claims against the counties], superseding HRS § 46-72." However, the court subsequently overruled that decision, holding:

> we overrule <u>Salavea</u> and all other decisions
> of the appellate courts of this state that
> rely on <u>Salavea</u> for the proposition that HRS

18

> § 662-4 supersedes HRS § 46-72.  We hold that
> counties do not fall within the ambit of the
> STLA and that HRS § 46-72, which the
> legislature is free to amend, is the statute
> of limitations applicable to actions against
> the counties.  However, in order to avoid
> unfair prejudice to plaintiffs who have
> detrimentally relied upon Salavea with
> respect to the statute of limitations
> governing tort claims against the counties,
> we emphasize that our holding is prospective
> only and applies to all claims for relief
> accruing after the date of this opinion.

Kahale v. City & County of Honolulu, 104 Haw. 341, 347-48, 90

P.3d 233, 239-40 (Haw. 2004).  Kahale has a filing date of May

12, 2004.  Therefore, tort claims against the County and the

official Defendants accruing after that date are governed by the

six-month statute of limitations in Haw. Rev. Stat. § 46-72,

while tort claims that accrued on or before May 12, 2004, are

governed by the two-year statute of limitations in Haw. Rev.

Stat. § 662-4.  Cf. Mitchell v. Dupnik, 75 F.3d 517, 527 (9th

Cir. 1996) (noting that a suit against a governmental officer in

his official capacity is a suit against the governmental entity

itself).

The court agrees with Defendants that Tongson's § 1983

claims are tort claims.  Pony v. County of Los Angeles, 433 F.3d

1138, 1143 (9th Cir. 2006) ("The Supreme Court has construed

claims brought under Section 1983 as tort claims for personal

injury.").

Tongson filed the original complaint on October 27,

2005.  His § 1983 claims that accrued on or before May 12, 2004,

are governed by the two-year statute of limitations and are

therefore time-barred if they accrued prior to October 27, 2003. Tongson's § 1983 claims accruing after May 12, 2004, are subject to the notice requirements in Haw. Rev. Stat. § 46-72 and are barred, as it is undisputed that Tongson did not provide the County with proper notice. See Haw. Rev. Stat. § 46-72; see also Ex. W (attached to Tongson MSJ) ¶¶ 1-4. Accordingly, because Tongson asserts his § 1983 claims against only the County and Lee in her official capacity, Tongson's only viable § 1983 claims are those that accrued between October 27, 2003, and May 12, 2004.

Because Tongson's First Amendment claims are brought pursuant to § 1983, Tongson's only actionable claims under the First Amendment are those that accrued during that time frame. Of all the bases of Tongson's First Amendment claims, as identified in Tongson's November 9 and 29, 2006, declarations and Exhibit 2 attached to Tongson's opposition memorandum,[4] only the following alleged retaliatory acts occurred between October 27, 2003, and May 12, 2004:  (1) on January 7, 2004, Lee allegedly "threatened [Tongson] by saying, 'you're lucky you still have a job,'" Tongson 11/29/2006 Decl'n ¶ 7; (2) in February 2004, Lee, Stebbins, and Andaya allegedly excluded Tongson from a meeting, Tongson 11/29/2006 Decl'n ¶ 3; (3) in February 2004, Lee,

---

[4] In this court's December 1, 2006, order, the court stated that, having not received further clarification from Plaintiffs as to the bases of their claims, the court, in identifying the basis of each claim brought by Plaintiffs, would "refer only to the evidence Plaintiffs previously pointed the court to:  (1) Plaintiffs' original declarations (attached to their opposition memoranda); (2) Plaintiffs' supplemental declarations (attached to their First Supplement); and (3) Exhibit 2 (attached to Tongson's opposition memorandum)."

Stebbins, and Andaya allegedly excluded Tongson from "the decision making involving the Grants Management Division on the New Age Workshop, Substance Abuse Strategy and Presentation of Needs Assessment to the County Council," Tongson 11/29/2006 Decl'n ¶ 4; and (4) on March 15, 2004, Lee, Edwin T. Okubo ("Okubo"),[5] and Andaya allegedly "constructively demoted [Tongson] to the position of Program Specialist IV (SR-20) Grants Management Division," Tongson 11/29/2006 Decl'n ¶ 8; Tongson 11/9/2006 Decl'n ¶ 13(f). All other alleged acts of retaliation stated in Tongson's declarations and Exhibit 2 are time-barred.[6]

    b.   <u>Merits of the First Amendment Claims.</u>

"In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003).

---

[5] Okubo is the Housing Division Administrator for the Department. Declaration of Edwin T. Okubo (9/21/2006) ("Okubo Decl'n") ¶¶ 1-2.

[6] The court notes that, in Exhibit 2, Tongson recounts several incidents between him and Stebbins that occurred within the statute of limitations for retaliation. For example, Tongson says that, during that time, Tongson and Stebbins went to various meetings and site visits. Ex. 2 (attached to Tongson Opp. at 5-8). However, nowhere has Tongson alleged that Stebbins's conduct at those meetings or site visits was in retaliation for his protected speech.

Regarding the first prong, "An employee's speech is protected under the First Amendment if it addresses 'a matter of legitimate public concern.'"   Id.   For example, speech concerning "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government" is protected by the First Amendment, whereas speech that concerns "individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies" is generally not protected by the First Amendment.   Id.

Regarding the second prong, the Ninth Circuit says that a plaintiff must "establish that the actions taken by the defendants were 'reasonably likely to deter them from engaging in protected activity under the First Amendment.'"   Id. at 976. Additionally, "a government act of retaliation need not be severe and it need not be of a certain kind," and "even minor acts of retaliation can infringe on an employee's First Amendment rights."   Id. at 975.

Under the third prong, there are "three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions":

> First, a plaintiff can introduce evidence
> regarding the "'proximity in time between the
> protected action and the allegedly
> retaliatory employment decision,'" from which
> a "'jury logically could infer that the
> plaintiff was terminated in retaliation for
> his speech.'"   Second, a plaintiff can
> introduce evidence that "his employer

22

> expressed opposition to his speech, either to
> him or to others."  Third, the plaintiff can
> introduce evidence that "his employer's
> proffered explanations for the adverse
> employment action were false and
> pre-textual."

Id. at 977(internal citations omitted).  The Ninth Circuit

"caution[s] that a specified time period cannot be a mechanically

applied criterion" and therefore "reject[s] any bright-line rule

about the timing of retaliation."  Id. at 977-78.  Rather,

"[w]hether an adverse employment action is intended to be

retaliatory is a question of fact that must be decided in the

light of the timing and the surrounding circumstances."  Id. at

978.

### i.   Protected Speech.

Defendants attack Tongson's allegedly protected speech

on various grounds.  First, Defendants argue that Tongson's

statements "do not constitute protected speech" because they

"were never reported, reported to people who already knew about

them, reported internally or reported to the union when Tongson

sought advice about the anticipated sexual harassment complaint."

Tongson MSJ at 21.  Citing no legal authority under the First

Amendment for these propositions, Defendants fail to meet their

burden of showing entitlement to judgment as a matter of law.

See Nissan Fire & Marine Ins., 210 F.3d at 1102.

Second, Defendants argue that "the primary motivation

of an employee claiming protection must be a desire to inform the

public on matters of public concern, and not personal

vindictiveness."  Tongson MSJ at 21 (citing Wolcott v. Champion

23

Int'l Corp., 691 F. Supp. 1052, 1065 (W.D. Mich. 1987); Methvin
v. Bartholomew, 971 P.2d 151, 155 (Alaska 1999)).  However,
Defendants fail to point to any evidence establishing that
Tongson's statements were motivated by anything other than "a
desire to inform the public on matters of public concern."  For
example, Tongson says he spoke out about Defendants' use of
"slush funds."  Tongson Opp. at 6.  Defendants respond by
referring to Tongson's deposition, in which he answered the
following question affirmatively:  "So, you think instead of
having the 3 percent go to other grantees or other projects, it
should only be used for administration like training?"  Ex. R
(attached to Tongson MSJ) at 43.  Because the transcript is
incomplete, the court is unable to determine the context
surrounding that question, including whether Tongson was even
discussing "slush funds."  Defendants also point to Lee's
declaration, in which she says:

> I understand that Mr. Tongson is alleging
> that I improperly used certain funds.  I do
> not recall being aware of these allegations
> until after the lawsuit was filed.  I have
> never improperly used any funds.  The only
> thing Mr. Tongson ever mentioned to me
> regarding the use of funds was his belief
> that the Maui County Council should not be
> deciding who receives grant funds for social
> programs.

Lee Decl'n ¶ 22.  Lee's declaration does not address whether
Tongson's speech arose from his desire to speak about matters of
public concern.

Third, Defendants contend that Tongson must show that
he had a "reasonable belief that the actions alleged were

unlawful." Tongson MSJ at 22.  Defendants cite to Gonsalves v. Nissan Motor Corp. in Haw., Ltd., 100 Haw. 149, 58 P.3d 1196 (Haw. 2002), which concerned retaliation claims under Haw. Rev. Stat. § 378-2, not the First Amendment.  Defendants rely on facts and cases that do not demonstrate their right to prevail on the issue of whether Tongson's statements were protected by the First Amendment.  Although Tongson, as Plaintiff, must show how he will meet his burden at trial, the court here draws all inferences in his favor.  Defendants come up short on this issue.

> ii.   Adverse Employment Action.

Defendants' only argument regarding any adverse employment action relies on Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006) ("White").  White addresses the legal standard for Title VII retaliation claims. Tongson MSJ at 29-30.  Defendants contend that their actions "have not stopped Tongson from speaking up."  Tongson MSJ at 29. However, even if this court considers White in the context of Tongson's First Amendment claims, Defendants are unpersuasive in arguing that there is no issue of fact as to the absence of any adverse employment action.

In the recent White decision, 126 S. Ct. at 2415-16, the United States Supreme Court addressed the scope of retaliatory acts prohibited by Title VII.  The Court noted, "The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  Id. at 2414.  The Court continued:

> The anti-retaliation provision protects an
> individual not from all retaliation, but from
> retaliation that produces an injury or
> harm. . . .   In our view, a plaintiff must
> show that a reasonable employee would have
> found the challenged action materially
> adverse, "which in this context means it well
> might have 'dissuaded a reasonable worker
> from making or supporting a charge of
> discrimination.'"

Id. at 2414-15.   The Court explained that, although "petty

slights or minor annoyances" are not actionable, "the

significance of any given act of retaliation will often depend

upon the particular circumstances," with the social impact of

workplace behavior depending on "a constellation of surrounding

circumstances, expectations, and relationships which are not

fully captured by a simple recitation of the words used or the

physical acts performed."   Id. at 2415.

The Court also emphasized the importance of using an

objective standard:

> We refer to reactions of a reasonable
> employee because we believe that the
> provision's standard for judging harm must be
> objective.  An objective standard is
> judicially administrable.  It avoids the
> uncertainties and unfair discrepancies that
> can plague a judicial effort to determine a
> plaintiff's unusual subjective feelings.  We
> have emphasized the need for objective
> standards in other Title VII contexts, and
> those same concerns animate our decision
> here.

Id.

Similarly, in Mendocino Envtl. Cent. v. Medocino

County, 192 F.3d 1283, 1300 (9th Cir. 1999) ("Mendocino"), the

26

Ninth Circuit addressed whether plaintiffs asserting a First
Amendment claim must establish that their speech was actually
chilled.  The court stated:

> In order to demonstrate a First
> Amendment violation, a plaintiff must provide
> evidence showing that "by his actions the
> defendant deterred or chilled [the
> plaintiff's] political speech and such
> deterrence was a substantial or motivating
> factor in [the defendant's] conduct."  Sloman
> v. Tadlock, 21 F.3d 1462, 1469 (9th Cir.1994)
> (citing Mendocino Env'l Ctr.[ v. Mendocino
> County, 14 F.3d 457, 464 (9th Cir. 1994)]).
> While this statement might be read to suggest
> that a plaintiff must demonstrate that his
> speech was actually inhibited or suppressed,
> our description of the elements of a First
> Amendment claim in Mendocino, which Sloman
> cited for its standard, requires only a
> demonstration that defendants "intended to
> interfere with [the plaintiff's] First
> Amendment rights."  Mendocino Env'l Ctr., 14
> F.3d at 464 (emphasis added).  Because it
> would be unjust to allow a defendant to
> escape liability for a First Amendment
> violation merely because an unusually
> determined plaintiff persists in his
> protected activity, we conclude that the
> proper inquiry asks "whether an official's
> acts would chill or silence a person of
> ordinary firmness from future First Amendment
> activities."  Crawford-El v. Britton, 93 F.3d
> 813, 826 (D.C. Cir.1996), vacated on other
> grounds, 520 U.S. 1273, 117 S. Ct. 2451, 138
> L. Ed. 2d 210 (1997) (internal quotation
> marks and citation omitted).

Id.; cf. Rhodes v. Robinson, 408 F.3d 559, 568-69 (9th Cir. 2005)
("Speech can be chilled even when not completely silenced. . . .
[The plaintiff's] allegations that his First Amendment rights
were chilled, though not necessarily silenced, is enough to
perfect his claim."); Rayford v. Omura, 400 F. Supp. 2d 1223,

1230-31 (D. Haw. 2005) ("a plaintiff in a retaliation case need demonstrate only that she or he was harmed by the government's action--and need not demonstrate both actual harm and chilling of future speech").

Under White and Mendocino, this court must apply an objective standard in asking whether Defendants' actions would "dissuade[] a reasonable worker from making or supporting a charge of discrimination" or "chill or silence a person of ordinary firmness," not whether Tongson was actually silenced. See White, 126 S. Ct. at 2414-15; Mendocino, 192 F.3d at 1300. Accordingly, the court rejects Defendants' argument that Tongson's First Amendment claims fail because he was not silenced by Defendants' conduct.

In arguing that their actions did not violate Tongson's First Amendment rights, Defendants point to evidence showing only that Tongson "recently submitted a complaint to the Managing Director alleging discrimination based upon race, age, sexual orientation, religion and marital status" and "has also continued to object and speak out about a variety of other issues." Tongson MSJ at 29-30.  Although Defendants argue that their actions "would not deter a reasonable person from speaking out," they submit no evidence supporting that assertion.  Tongson MSJ at 29.  Tongson himself avers, "After being retaliated against for my protected speech, I was 'chilled' from disclosing . . . new violations I discovered in 2005, for fear of further reprisal

against me." Tongson 11/9/2006 Decl'n ¶ 13. Given the law on
this point and Tongson's statement, the County fails to meet its
burden as the movant of showing the absence of a question of fact
on this issue. See T.W. Elec. Serv., Inc., 809 F.2d at 630.

iii. Substantial and Motivating Factor.

Defendants contend that Tongson is unable to
demonstrate that "any alleged protected speech was a substantial
and motivating factor in decisions." Tongson MSJ at 28.
Defendants state:

> Tongson is unable to meet his burden.
> None of the actions taken were in retaliation
> for any alleged "whistleblowing". All of the
> actions were taken for legitimate and
> appropriate reasons. Ex. "BB" at ¶¶ 24-27;
> Ex. "T" at ¶¶ 18-19, 21, Ex. "V" at ¶¶ 30-31.

Tongson MSJ at 29.

Exhibit BB is the declaration of Okubo, who was the
Housing Division Administrator for the Department and became
Tongson's supervisor when Tongson was assigned to the Housing
Division. Okubo Decl'n ¶¶ 1, 3. After Tongson was assigned to
the Housing Division, Okubo says he: (1) requested Tongson's
input regarding Tongson's position description; (2) allowed
Tongson to choose a chair, desk, and permanent office, when they
became available; (3) directed Tongson to work at another work
station while housing inspectors investigated mold in Tongson's
office; and (4) questioned Tongson about sick leave and paid
administrative leave. Okubo Decl'n ¶¶ 4-9, 13-15, 17. Okubo
also says:

24. All of the actions I have taken
    regarding Mr. Tongson, including those
    identified above, were made because I
    believed they were necessary and
    appropriate in order to manage the
    Housing Division.

    . . . .

26. My actions have not been in retaliation
    for any actions or statements which Mr.
    Tongson may have taken.  I have no
    reason to retaliate against Mr. Tongson.

Okubo Decl'n ¶¶ 24-26.  Okubo is not a named Defendant.

Exhibit T is Lee's declaration, in which she says:

18. My decision to investigate the sexual
    harassment complaint by Wendy Stebbins,
    to place Mr. Tongson on administrative
    leave with pay, to transfer Mr. Tongson
    and to suspend Mr. Tongson for five days
    were not influenced in any manner by any
    complaints or concerns which Mr. Tongson
    may have expressed.  I made these
    decisions after seeking advice and based
    upon my belief on what was required by
    law and appropriate and necessary.

19. Mr. Tongson's filing of the EEOC
    complaint and the lawsuit did not
    influence my decisions in any manner.

    . . . .

21. All of the actions which I have taken
    involving Mr. Tongson were done in order
    to properly manage the Department, such
    as reassigning of grants and other
    duties.  Nothing I have done related in
    any way to the things which Mr. Tongson
    claims he spoke out about.

Lee Decl'n ¶¶ 18-21.

Exhibit V is the declaration of Andaya, who is the
Deputy Director of the Department and was assigned to investigate

Stebbins's sexual harassment complaint against Tongson.

Declaration of Herman Andaya (9/27/06) ("Andaya Decl'n") ¶¶ 1, 9.

Andaya says:

> 30.   None of the items which Mr. Tongson
>       allegedly spoke about influenced my
>       investigation or conclusions in any
>       manner.
>
> 31.   Mr. Tongson's filing of the EEOC
>       complaint and the lawsuit did not
>       influence my investigation or
>       conclusions in any manner.

Andaya Decl'n ¶¶ 30-31.  Andaya is not a named Defendant.

Tongson does not submit any evidence disputing the foregoing declarations.  Tongson merely asserts:

(1) "Defendants['] motive for retaliating against [Tongson] was the fear that entitlement to Federal HUD and/or State monies would be jeopardized"; and (2) "Defendants County and Lee's motive for retaliation included the fear of criminal and/or civil prosecution and/or termination of employment for committing fraud and theft."  Tongson Opp. at 13-14.  Tongson fails to cite to any evidence for these propositions.  This court understands, of course, that plaintiffs rarely have admissions of retaliatory motive from defendants.  But plaintiffs must have some evidence from which retaliatory motive may be inferred, or they cannot prevail at trial.  In the face of direct denials by defense witnesses, Tongson makes no attempt to show how he will meet his burden of proof at trial.  The only evidence before this court establishes that any allegedly adverse actions taken against

31

Tongson by Okubo, Lee, and Andaya were not motivated by Tongson's alleged protected speech.  See Coszalter, 320 F.3d at 973; see also Okubo Decl'n ¶¶ 24, 26; Lee Decl'n ¶¶ 18-19, 21; Andaya Decl'n ¶¶ 30-31.  Accordingly, the court grants summary judgment in favor of Lee and concludes that the sole remaining adverse employment action is Tongson's allegation that Stebbins excluded him from a meeting and from "the decision making involving the Grants Management Division on the New Age Workshop, Substance Abuse Strategy and Presentation of Needs Assessment to the County Council" in February 2004.  Tongson 11/29/2006 Decl'n ¶¶ 3-4.

### iv.   Minor Acts by Defendants.

Regarding the remaining adverse employment actions, Defendants argue that they "are so insignificant that even if true, they do not constitute retaliation."  Tongson MSJ at 26. The court rejects this argument in light of the Ninth Circuit's holding that "a government act of retaliation need not be severe and it need not be of a certain kind" in order to constitute an adverse employment action."  See Coszalter, 320 F.3d at 975. "Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights."  Id.

### 3.   Count 2:  Retaliation under the HWPA.

Defendants argue they are entitled to summary judgment on Tongson's HWPA claims because he filed this lawsuit more than ninety days after receiving the right-to-sue letter from the HCRC.  Tongson Reply at 7.  The court is unpersuaded by that

argument.  Defendants also argue that Tongson's HWPA claims "must be dismissed" because he did not provide the County with notice under Haw. Rev. Stat. § 46-72 and because Tongson's alleged protected speech did not touch on matters "regarding a violation of law."  Tongson MSJ at 22, 31.  The court limits the HWPA claim pursuant to Haw. Rev. Stat. § 46-72.

Regarding the timeliness of Tongson's lawsuit, Defendants cite no law requiring Tongson to file his HWPA claims within ninety days of receiving a right-to-sue letter from HCRC. According to Haw. Rev. Stat. § 378-63, "[a] person who alleges violation of [the HWPA] may bring a civil action for appropriate injunctive relief, or actual damages, or both within two years after the occurrence of the alleged violation of [Haw. Rev. Stat. § 378-62]."

Tongson's HWPA claims sound in tort and are asserted against the County and Lee in her official capacity only.  Cf. Norris v. Hawaiian Airlines, Inc., 74 Haw. 235, 239, 258-65 842 P.2d 634, 637, 645-48 (Haw. 1992) (referring to the plaintiff's claim under the HWPA as a state tort claim).  The HWPA claims are therefore governed by the notice requirement in Haw. Rev. Stat. § 46-72.  As discussed above, that provision requires that claimants notify the County of their tort claims against it "within six months after the injuries are received."  Haw. Rev. Stat. § 46-72.  As section 46-72 applies only to tort claims that accrued after May 12, 2004, Tongson's HWPA claims accruing after

that date are barred because Tongson did not so notify the County.  See Kahale, 104 Haw. at 348, 90 P.3d 240.  As with Tongson's First Amendment claims brought pursuant to § 1983, his HWPA claims accruing before October 27, 2003, are also time-barred.  See Haw. Rev. Stat. § 378-63.

Turning to the merits of Tongson's remaining HWPA claims, the court reviews Haw. Rev. Stat. § 378-62, which provides in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

> (1) The employee . . . reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:

> (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States.

The HWPA "provides protection to employees who report suspected violations of law from 'any form of retaliation by their employers.'"  Crosby v. State of Hawaii Dep't of Budget & Finance, 76 Haw. 332, 341, 876 P.2d 1300, 1309 (Haw. 1994).  As a remedial statute, the HWPA should be construed liberally to accomplish the purpose for which it was enacted.  Id. at 341-42, 876 P.2d at 1309-10.

For an employee to prevail under the HWPA, "the employer's challenged action must have been taken 'because' the

employee engaged in protected conduct in order to be considered 'discriminatory' under the HWPA." Id. at 342, 876 P.2d at 1310; see also Nelson v. Nat'l Car Rental Sys., Inc., Civ. No. 05-00374 JMS/LEK, 2006 WL 1814341, at *3 (D. Haw. June 30, 2006) ("On its face, the statue requires only that an employee either report, or be about to report, a violation of the law and that the employer take some adverse action against the employee as a result. . . . [T]he Hawaii Supreme Court has not identified any elements to the cause of action in addition to those clearly contained in the statute."). "In other words, a causal connection between the alleged retaliation and the 'whistleblowing' is required." Crosby, 76 Haw. at 34, 876 P.2d at 1310. Once the employee shows that the employer's disapproval of his speech played a role in the employer's action against him, "the employer can defend affirmatively by showing that the [adverse employment action] would have occurred regardless of the protected activity." Id. ("the employer has an affirmative defense (no causation), as to which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts").

Tongson claims that the same acts of retaliation by Defendants that allegedly violated the First Amendment were retaliatory acts for purposes of the HWPA. Defendants consequently present the same arguments with respect to Tongson's HWPA claims as they do for his First Amendment claims. As

discussed above, because the only evidence before the court indicates that the allegedly adverse employment actions by Okubo, Lee, and Andaya were not motivated by Tongson's whistleblowing, their actions do not support Tongson's HWPA claims.  See Crosby, 76 Haw. at 34, 876 P.2d at 1310.  The court grants summary judgment in favor of Lee and concludes that, as with Tongson's First Amendment claims, the only act of retaliation remaining before this court is Tongson's allegation that Stebbins excluded him from a meeting and from "the decision making involving the Grants Management Division on the New Age Workshop, Substance Abuse Strategy and Presentation of Needs Assessment to the County Council" in February 2004.  Tongson 11/29/2006 Decl'n ¶¶ 3-4.

In addition to the arguments raised with respect to Tongson's First Amendment claims, Defendants also cite to cases construing Minnesota's whistleblower act in asserting that "Tongson had to speak out regarding a violation of law."  Tongson MSJ at 22.  In Hitchcock v. FedEx Ground Package Sys., Inc., 442 F.3d 1104, 1106 (8th Cir. 2006), the Eighth Circuit stated, "To be protected under [Minnesota's whistleblower act], an employee must make the report for the purpose of exposing an illegality." See also Rothmeier v. Inv. Advisers, Inc., 556 N.W.2d 590, 593 (Minn. 1997) (noting that a plaintiff must do more than merely give his supervisor feedback); cf. Cockley v. City of Otsego, 623 N.W.2d 625, 631 (Minn. 2001) ("Whether an employee made a report in 'good faith' is a question of fact, but the court may

determine as a matter of law that certain conduct does not constitute a report for purposes of the [Minnesota] Whistleblower Act."). However, the court cannot, on this record, conclude that Tongson cannot show that he reported the alleged violations "for the purpose of exposing an illegality." See Rothmeier, 556 N.W.2d at 593. Even assuming that the law applicable to Minnesota's whistleblower act is applicable to the HWPA, the court, drawing all inferences in Tongson's favor, is unpersuaded that there is no question of fact as to whether Tongson's purpose in reporting the alleged violations was to expose Defendants' illegalities.

Accordingly, the court denies summary judgment on Tongson's HWPA claims against the County, but limits his claims to those that accrued between October 27, 2003, and May 12, 2004, and limits the adverse employment actions to Stebbins's alleged exclusion of Tongson from a meeting and from "the decision making involving the Grants Management Division on the New Age Workshop, Substance Abuse Strategy and Presentation of Needs Assessment to the County Council" in February 2004. Tongson 11/29/2006 Decl'n ¶¶ 3-4.

### 4. Count 4:  IIED Claims.

Defendants urge this court to grant summary judgment on Tongson's IIED claims, arguing that Defendants' conduct "does not constitute outrageous behavior." Tongson MSJ at 31. Regarding Tongson's IIED claim against the County, Defendants contend that

Tongson has not complied with the notice requirements in Haw. Rev. Stat. § 46-72.   The court grants summary judgment in favor of the official Defendants, but denies summary judgment with respect to them individually.   The court limits Tongson's IIED claim against the County to those that relate to his retaliation claims under Haw. Rev. Stat. § 378-2.

"Generally, the workers' compensation scheme serves to bar a civil action for physical and emotional damages resulting from work-related injuries and accidents."   Nelson v. Univ. of Haw., 97 Haw. 376, 393, 38 P.3d 95, 112 (Haw. 2001).   The exclusive remedy provision of Hawaii's workers' compensation law precludes certain claims against employers:

> The rights and remedies herein granted to an employee . . . on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee . . . to recover damages from the employer, at common law or otherwise, on account of injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

Haw. Rev. Stat. § 386-5; Luzon v. Atlas Ins. Agency, Inc., 284 F. Supp. 2d 1261, 1263 (D. Haw. 2003) ("Under Hawaii law, claims for negligent infliction of emotional distress [against a plaintiff's employer] are barred by Haw. Rev. Stat. § 386-5, unless the claims relate to sexual harassment or assault."); Beaulieu v. Northrop Grumman Corp., 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) ("Under Hawaii law, Worker's Compensation is the exclusive remedy

against an employer for employee injuries outside of those related to sexual harassment or sexual assault . . . . The Court finds that the claims of Negligent Supervision and Retention and Negligent Infliction of Emotional Distress, are both 'work injuries' arising from the conditions of Plaintiff's employment. These claims, therefore are all barred by H.R.S. § 386-5."); Nelson, 97 Haw. at 393-94, 38 P.2d at 112-13 ("HRS § 386-5 was amended in 1992 to include an exception to the exclusive remedy provision of the workers' compensation law for certain claims related to sexual harassment and sexual assault.").

Also excepted from the exclusivity provision in Haw. Rev. Stat. § 386-5 are employees' claims against employers "for intentional infliction of emotional distress when the employer has unlawfully discriminated against the employee in violation of HRS § 378-2." Takaki v. Allied Mach. Corp., 87 Haw. 57, 59, 951 P.2d 507, 509 (Haw. 1998); see also Lesane v. Hawaiian Airlines, 75 F. Supp. 2d 1113, 1122 (D. Haw. 1999) ("Defendant's argument is misplaced because 'the supreme court has recognized that an employee may bring an action against his or her employer for intentional infliction of emotional distress caused by discrimination in violation of H.R.S. § 378-2, and that such an action is not bared by the exclusivity provision in H.R.S. § 386-5.").

As it is undisputed that the County was Tongson's employer and that his claims against the official Defendants are

claims against the County itself, the exclusivity provision in section 386-5 applies to Tongson's IIED claims against the County and the official Defendants.  See Mitchell, 75 F.3d at 527.  None of Tongson's IIED claims against them falls within the express exception in section 386-5, as he does not assert claims for sexual harassment or sexual assault.  Further, although Tongson does assert that the County violated Haw. Rev. Stat. § 378-2 when it retaliated against him, Tongson does not claim that Lee or Stebbins violated section 378-2.  The court therefore grants summary judgment in favor of the official Defendants on the IIED claim, except with respect to Tongson's claims asserted against the County relating to alleged violations of section 378-2.[7]

Regarding Tongson's claims against Lee and Stebbins individually, Defendants argue that they are entitled to summary judgment because "[m]ost actions taken [by them] are insignificant" and because "no one would deem them outrageous." Tongson MSJ at 31.  This statement is a mere conclusion unsupported by law or evidence.  The court denies summary judgment on Tongson's IIED claims against Lee and Stebbins in their individual capacities.

     5.    Count 5:  Gender Discrimination Under Title VII.

---

[7] As discussed above with respect to Tongson's § 1983 claims, because IIED claims are tort claims, Tongson's IIED claim against the County is similarly limited to acts that occurred between October 27, 2003, and May 12, 2004.

The County argues that it is entitled to summary judgment on Tongson's gender discrimination claim under Title VII. Tongson MSJ at 6-13. The County asserts that "Tongson is unable to prove a prima facie case because he can not prove Defendants intentionally discriminated against him because he is a male or that the actions taken had a discriminatory effect on males." Tongson MSJ at 7. The County also contends that it "had legitimate, nondiscriminatory reasons for investigating and disciplining Tongson." Tongson MSJ at 7. The court grants summary judgment on this claim.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of a protected characteristic." Cornwell v. Elctra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006). To prevail on a disparate treatment claim, a plaintiff must "prove that the employer acted with conscious intent to discriminate." Costa v. Desert Palace, Inc., 299 F.3d 838, 854 (9th Cir. 2002).

When a defendant moves for summary judgment on a Title VII gender discrimination claim, the plaintiff alleging disparate treatment may respond in one of two ways:

> when responding to a summary judgment motion,
> the plaintiff is presented with a choice
> regarding how to establish his or her case.
> [The plaintiff] may proceed by using the
> McDonnell Douglas framework, or
> alternatively, may simply produce direct or
> circumstantial evidence demonstrating that a
> discriminatory reason more likely than not
> motivated [the defendant].

McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).

"Under the McDonnell Douglas burden shifting framework, a plaintiff must first establish a prima facie case of unlawful discrimination," which requires the plaintiff to show that "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." Id. at n.16 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973)); Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123 (9th Cir. 2000). "The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action.  If the employer does so, the plaintiff must show that the articulated reason is pretextual." McGinest, 360 F.3d at 1122 n.16.

Prior to bringing a lawsuit under Title VII, a plaintiff is required to "first file an EEOC complaint against the allegedly discriminatory party before bringing a Title VII suit in federal court." Stache v. Int'l Union of Bricklayers & Allied Craftsmen, AFL–CIO, 852 F.2d 1231, 1233 (9th Cir. 1988). "Generally, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last act of

discrimination," which "serves as a judicial statute of
limitations as well, generally barring subsequent suit on
discriminatory incidents occurring prior to the 180-day period."
MacDonald v. Grace Church Seattle, 457 F.3d 1079, 1082 (9th Cir.
2006); Sosa v. Hiraoka, 920 F.2d 1451, 1455 (9th Cir. 1990).

        Tongson filed a complaint with the EEOC alleging gender
discrimination on May 31, 2005.  Ex. X (attached to Tongson MSJ)
at 6-7.  Therefore, any claim of gender discrimination that
occurred prior to December 2, 2004, which marks 180 days before
that complaint was filed, is time-barred.  See Sosa, 920 F.2d at
1455.  Likewise, as Tongson has not established that he exhausted
his administrative remedies regarding gender discrimination
claims that occurred after May 31, 2005, those claims are also
time-barred.[8]  Only acts of gender discrimination that occurred
between December 2, 2004, and May 31, 2005, are properly before
this court.

        In the FAC, Tongson's opposition memorandum, and
Tongson's declarations, he details the adverse employment actions
that form the basis of his gender discrimination claim.  The
court disregards those bases that do not have a corresponding
date, as this court is unable to determine whether they fall

_____

        [8] The court is aware that Tongson exhausted his
administrative remedies regarding claims he asserted in his
second EEOC complaint, which he filed on December 5, 2005.
Ex. AA (attached to Tongson MSJ).  However, that complaint was
not based on gender discrimination.  If Tongson filed any other
gender discrimination claims with the EEOC, he has not
established that he exhausted those remedies prior to bringing
this lawsuit.

within the statute of limitations period and because the court
allowed Tongson to provide pertinent dates before and after the
hearing.  All the bases for which dates are provided are time-
barred, except Tongson's claim that the County placed him "out of
work on administrative leave from 8/18/04 to 11/15/05."  <u>See</u>
Tongson 11/9/2006 Decl'n ¶ 16; Tongson 11/29/2006 Decl'n
¶¶ 11-17; Tongson Opp. at 19-21.

       Regarding Tongson's assertion that the County engaged
in gender discrimination by placing him on administrative leave,
even assuming Tongson can establish a <u>prima</u> <u>facie</u> case that the
County engaged in gender discrimination, the County meets its
burden of showing that "the employment decision had not been
motivated by discriminatory animus."  <u>Raad v. Fairbanks N. Star</u>
<u>Borough Sch. Dist.</u>, 323 F.3d 1185, 1196 (9th Cir. 2003).  Lee
explains in her declaration that, after Stebbins informed her
that she wanted to file a sexual harassment complaint against
Tongson, Lee "sought legal advice from the Department of
Corporation Counsel and the Department of Personnel Service."
Lee Decl'n ¶ 3.  Lee says that, "after seeking legal advice and
advice from DPA, I believed that Mr. Tongson had to be placed on
administrative leave and it could be with or without pay."  <u>Id.</u>
¶ 4.  Lee says that she ultimately "decided to place Mr. Tongson
on paid administrative leave effective August 30, 2004 in order
to separate him from Wendy Stebbins."  <u>Id.</u> ¶ 6.  Lee also says
that her decision to place Tongson on administrative leave was
made "based upon my belief of what was required by law and

appropriate and necessary." Id. ¶ 18.  She says that her decision was "not influenced in any manner by any complaints or concerns which [Tongson] may have expressed." Id. ¶ 18.

Because the County produced evidence through Lee of a nondiscriminatory basis for placing Tongson on administrative leave, the burden shifts to Tongson to "demonstrate that the proffered reason was not the true reason for the employment decision." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).  Tongson may meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. Tongson comes forward with no evidence showing that a discriminatory reason more likely motivated Defendants or that Lee's explanation is "unworthy of credence." See id.; McGinest, 360 F.3d at 1122 n.16.  The court therefore grants summary judgment in favor of the County on Tongson's Title VII gender discrimination claim.

6.   Count 6:  Breach of Implied Contract Claim.

The County also seeks summary judgment on Tongson's breach of implied contract claim.  Tongson MSJ at 13–15.  It argues that "there is no 'legally cognizable cause of action" for a breach of equal employment opportunity policies and procedures" and that there can be no implied contract where there is no meeting of the minds.  Tongson MSJ at 14 (citing Pecoraro v. New Haven Register, 344 F. Supp. 2d 840, 844 (D. Conn. 2004); Lesane

v. <u>Hawaiian Airlines</u>, 75 F. Supp. 2d 1113 (D. Haw. 1999))
(ellipses points omitted).  Tongson responds that the County
violated its Sexual Harassment Policy when it:  (1) placed
Tongson on "administrative leave before he was allowed to hear
and respond to the false sexual harassment accusations";
(2) "treated [Tongson] differently than it did Defendant
Stebbins"; and (3) "did not prepare a written report of findings
within '10 working days' and in fact took 15 months."  Tongson
Opp. at 21.  The court denies summary judgment on this claim.

In <u>Kinoshita v. Canadian Pacific Airlines, Ltd.</u>, 68
Haw. 594, 605, 724 P.2d 110, 113 (Haw. 1986), the Hawaii Supreme
Court was faced with the question of whether employee rules
constituted a contract enforceable by employees.  In that case,
two part-time passenger agents employed at will by Canadian
Pacific Airlines ("CPA") were fired, after having been implicated
in a drug smuggling conspiracy.  <u>Id.</u> at 597-600, 724 P.2d at
113-15; <u>see also</u> <u>Calleon v. Miyagi</u>, 76 Haw. 310, 315-16, 876 P.2d
1278, 1283-84 (Haw. 1994).  Upon their firing, both employees
were informed by CPA that they would not be allowed to appeal
their discharges because of the seriousness of the charges
against them.  <u>Kinoshita</u>, 68 Haw. at 599, 724 P.2d at 115; <u>see
also</u> <u>Calleon</u>, 76 Haw. at 315, 876 P.2d at 1283.  However, CPA had
previously promulgated employee rules allowing employees to
appeal adverse employment decisions.  <u>Kinoshita</u>, 68 Haw. at 598,
724 P.2d at 114; <u>see also</u> <u>Calleon</u>, 76 Haw. at 315, 876 P.2d at
1283.

Both of the fired employees filed suit in state court, claiming, among other things, that CPA breached the employee rules by denying them appeal rights. Kinoshita, 68 Haw. at 597, 724 P.2d at 113; see Calleon, 76 Haw. at 316, 876 P.2d at 1284. The lawsuit was removed to federal court, where the contract claim was dismissed. Kinoshita, 68 Haw. at 597, 724 P.2d at 113; see Calleon, 76 Haw. at 316, 876 P.2d at 1284. The employees appealed to the Ninth Circuit, which certified the following question to the Hawaii Supreme Court: "Do [CPA's] Employee Rules under Hawaii State law constitute a contract enforceable by the employees?" Kinoshita, 68 Haw. at 597, 724 P.2d at 113.

The Hawaii Supreme Court adopted the reasoning of the Washington Supreme Court, ruling that, "if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." Id. at 602-03, 724 P.2d at 116-17 (emphasis in original); see Calleon, 76 Haw. at 316, 876 P.2d at 1284. The court also noted:

> the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that whatever the personnel policies and practices, they are established and official at any given

> time, purport to be fair, and are applied
> consistently and uniformly to each employee.

Kinoshita, 68 Haw. at 602, 724 P.2d at 116 (quoting Toussaint v.
Blue Cross & Blue Shield, 292 N.W.2d 880, 892 (Mich. 1980)).
Applying this rule to the case before it, the Hawaii Supreme
Court held that "CPA's promulgated employee rules did, in fact,
include 'promises of specific treatment in specific situations,'
and that CPA had also clearly encouraged its employees to rely on
the promulgated rules." Calleon, 76 Haw. at 316, 876 P.2d at
1284.  The court concluded "that CPA's employee rules did
constitute a contract under which CPA was bound to follow those
provisions concerning specific treatment in specific situations
set forth in the rules." Id. at 316, 876 P.2d at 1284 (noting
that "CPA had breached such contract when it refused to allow the
fired employees to appeal their terminations as set forth in the
rules").

In Calleon, 76 Haw. at 316-17, 876 P.2d at 1284-85, the
Hawaii Supreme Court applied its holding in Kinoshita to a
"personnel policies and procedures manual" promulgated by the
plaintiff's former employer.  The plaintiff claimed that his
former employer breached promises made in its manual when it
fired him.  Id. at 314, 876 P.2d at 1282.  The court noted that,
unlike the employee rules at issue in Kinoshita, "there were very
few specific procedures included in the manual" and that "the
manual at issue does not appear to meet the requirements of
Kinoshita." Id. at 316-17, 876 P.2d at 1284-85.

The County seeks summary judgment on Tongson's claim that it breached its Sexual Harassment Policy, but does not address whether that policy "creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations" or induced Tongson to remain on the job and not to actively seek other employment.  See Kinoshita, 68 Haw. at 602-03, 724 P.2d at 116-17 (emphasis omitted); see also Calleon, 76 Haw. at 316, 876 P.2d at 1284.  Absent some discussion of whether the policy is an enforceable contract under Kinoshita, the County fails to show entitlement to summary judgment on this claim.

### 7.   Count 7:  Defamation Claim.

Stebbins contends that she is entitled to summary judgment on Tongson's defamation claim because the statements made in her sexual harassment complaint were truthful, her own opinions, and not defamatory.  Tongson MSJ at 31-34.  Tongson responds that he can prove all of the elements of a defamation claim.  Tongson Opp. at 22.  The court grants summary judgment on this claim.

Under Hawaii law, four elements are necessary to establish a claim for defamation:

> (1) a false and defamatory statement concerning another;
> (2) an unprivileged publication to a third party;
> (3) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and

          (4) either actionability of the statement
irrespective of special harm or the existence
of special harm caused by the publication.

Gonsalves, 100 Haw. at 171, 58 P.3d at 1218 (brackets in

original).  "The threshold issue in defamation cases is whether,

as a matter of law, the statements at issue are reasonably

susceptible of a defamatory meaning." Gold v. Harrison, 88 Haw.

94, 101, 962 P.2d 353, 360 (Haw. 1998).  Additionally, "truth is

an absolute defense to defamation." Gonsolves, 100 Haw. at 173,

58 P.3d at 1220.

      In her sexual harassment complaint, Stebbins claimed

that Tongson:  (1) touched her hand, back, shoulder, and waist;

(2) wrote her a poem; (3) told her, "I love you"; and

(4) complimented her with phrases, such as "you look so pretty

today" and "you look so nice today."  Ex. B (attached to Tongson

MSJ) at 1-5.  Tongson was interviewed during the investigation

into Stebbins's sexual harassment complaint and admitted that he:

(1) touched Stebbins, though that was "done accidentally or

unintentionally or in a friendship way," it "was common for both

of them to act in this matter [sic]," and the physical contact

was meant "to assure Stebbins that he will help her . . . and

everything will be alright"; (2) gave her the poem, which he

acknowledged "she resented"; and (3) told her, "I love you as a

friend."  Ex. E (attached to Tongson MSJ) at 1, 3-4.  Tongson

explained that his behavior toward Stebbins "was aimed at

consoling her" because he felt he "need[ed] to be there as a

friend."  Ex. E (attached to Tongson MSJ) at 4.  During Tongson's

deposition, he also stated that he:  (1) touched Stebbins;
(2) wrote the poem for her and that the poem upset her; (3) told
her, "I love her as a friend"; and (4) complimented her by saying
she looked "pretty" and "nice."  Ex. R (attached to Tongson MSJ)
at 260, 266-67, 273, 276-78.  Tongson also testified that he
would not care, be afraid, or be embarrassed if people knew that
he touched Stebbins's hand, back, or shoulder.  Ex. R (attached
to Tongson MSJ) at 278-79.  Stebbins argues that this evidence
establishes the truthfulness of her complaint.  Tongson MSJ
at 32.

Tongson does not contend or show that the statements
made in Stebbins's sexual harassment complaint were untrue.
Tongson does not seek to explain away his admissions.  Rather,
Tongson relies on the unsupported allegation that "Stebbins made
false and defamatory statements against [him] when she initiated
a false sexual harassment case against him."  Tongson Opp. at 22.
This statement does not constitute "specific facts showing that
there is a genuine issue for trial."  Porter, 383 F.3d at 1024.
There is, on the present record, no genuine dispute as to the
truthfulness of the allegations Stebbins made in her sexual
harassment complaint.  The court therefore grants summary
judgment in favor of Stebbins on Tongson's defamation claim.  See
Gonsolves, 100 Haw. at 173, 58 P.3d at 1220 ("truth is an
absolute defense to defamation").

8.    Count 8:  Retaliation Under Title VII and
      Haw. Rev. Stat. § 378-2.

The County argues that it is entitled to summary judgment on Tongson's retaliation claim under Title VII and Haw. Rev. Stat. § 378-2 because "Tongson has not suffered any adverse [employment] action." Tongson MSJ at 29. Acknowledging that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," the County contends, "The actions taken would not deter a reasonable person from speaking out." Tongson MSJ at 29. The court grants summary judgment on this claim.

Title VII provides that an employer may not "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). The burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for his decision, and the plaintiff bears the ultimate burden of demonstrating that the reason given was "merely a pretext for a discriminatory motive." Id.

Like Title VII, Haw. Rev. Stat. § 378-2 makes discriminatory retaliation illegal.  See Mukaida v. State of Hawaii, 159 F. Supp. 2d 1211, 1225 (D. Haw. 2001); see also Haw. Rev. Stat. § 378-2(2) (noting that it is an "unlawful discriminatory practice" for an employer to "discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part").  Hawaii courts have adopted the legal standard used by federal courts analyzing Title VII retaliation claims.  Schefke, 96 Haw. at 426-26, 32 P.3d 69-70.  In that regard, the Hawaii Supreme Court has held:

> Consistent with the approach under Title VII . . . , we hold that a retaliation claim under HRS § 378-2(2) is subject to the following three-part test:  (1) the plaintiff must first establish a prima facie case of such retaliation by demonstrating that (a) the plaintiff (i) "has opposed any practice forbidden by HRS chapter 378, Employment Practices, Part I, Discriminatory Practices or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part," (b) his or her "employer, labor organization, or employment agency has discharged, expelled, or otherwise discriminated against the plaintiff," and (c) "a causal link has existed between the protected activity and the adverse action"; (2) if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual.

<u>Schefke v. Reliable Collection Agency, Ltd.</u>, 96 Haw. 408, 426, 32 P.3d 52, 70 (Haw. 2001) (internal citations omitted).

Tongson identifies only three allegedly adverse employment actions in connection with his retaliation claims under Title VII and section 378-2:  (1) he was allegedly required to "retak[e] a sexual harassment course"; (2) a "suspension [of] 5 days" was imposed on him; and (3) a "disciplinary action letter [was] placed in [his] file."  FAC ¶ 69; <u>see also</u> Tongson Opp. at 22.  Tongson was indeed required to retake the sexual harassment course and suspended after the County determined that he had violated its Sexual Harassment Policy.  Ex AA (attached to Tongson MSJ) at 4; <u>see also</u> Lee Decl'n ¶ 16.  A copy of the letter informing Tongson that he was suspended and required to retake the course was also placed in his personnel file.  Ex AA (attached to Tongson MSJ) at 4; <u>see also</u> Lee Decl'n ¶ 16.

Lee declares that these actions taken against Tongson were not influenced by Tongson's filing of the EEOC complaints or the present lawsuit.  Lee Decl'n ¶¶ 18-19; <u>see also</u> Ex. 7 (attached to Tongson Opp.).  Tongson provides no evidence, direct or indirect, showing or suggesting that the County's proffered reason was pretextual.  The court therefore grants summary judgment on Tongson's retaliation claims under Title VII and section 378-2.

    B.   <u>Defendants' Motion Regarding Claims Asserted by Nemoto and Javier.</u>

       1.  <u>Lee's Qualified Immunity.</u>

Lee argues that she is entitled to qualified immunity from Nemoto's and Javier's claims under federal and state law. Nemoto and Javier MSJ at 45-46.  The only federal law claim asserted against Lee is that she violated the First Amendment by retaliating against Nemoto and Javier.  However, this claim is asserted against Lee in her official capacity only.  As qualified immunity applies only to defendants sued in their individual capacities, the court rejects Lee's argument that she is qualifiedly immune from the First Amendment claims.  See Hernandez v. Gates, 100 F. Supp.2d 1209, 1212-13 (C.D. Cal. 2000) ("Where an official is sued in an individual capacity, he or she may assert qualified immunity as an affirmative defense."); Nicole M. ex rel. Jacqueline M. v. Martinez Unified Sch. Dist., 964 F. Supp. 1369, 1379 (N.D. Cal. 1997), superseded on other grounds by Cal. Educ. Code § 262.5 ("qualified immunity applies only insofar as [the defendant] is being sued in her individual capacity, since qualified immunity is not available to a government official being sued in her official capacity"); Hyland v. Wonder, No. C-90 0646 MHP, 1993 WL 356891, at *6 (N.D. Cal. Sept. 2, 1993) ("qualified immunity protects government officials from section 1983 suits only when such officials are sued in their personal capacities--such immunity is irrelevant to official-capacity suits"); cf. Mukaida, 159 F. Supp. 2d at 1237 ("[q]ualified immunity bars claims against state officials in their individual capacities").

Additionally, Lee does not, on the present record, establish that she has qualified immunity with respect to the state law claims, which Nemoto and Javier bring against her in her official and individual capacities.  Lee asserts, "Plaintiffs have the burden of proving by clear and convincing evidence that Defendant Lee was motivated by malice and not by an otherwise proper purpose" and that "Plaintiffs cannot meet their burden of proof to show malice by Defendant Lee."  Nemoto and Javier MSJ at 46.  Lee says nothing more on the subject.  Without more than this mere conclusion, Lee does not meet her burden as the movant on the qualified immunity issue.

2.   Count 1:  Retaliation Claims Under the First Amendment.

Defendants argue that Nemoto's and Javier's retaliation claims brought pursuant to § 1983 fail, as the "County is not liable" for such claims.  Nemoto and Javier MSJ at 36–37.  Defendants also argue that Nemoto and Javier have not engaged in protected speech, that they have not been subjected to adverse employment action, and that Defendants' actions were not substantially motivated by Nemoto's and Javier's speech.

a.   Section 1983.

The First Amendment claims are brought pursuant to 42 U.S.C. § 1983.  As discussed above with respect to Tongson's § 1983 claims, Nemoto's and Javier's § 1983 claims are likewise

actionable only if they accrued between October 27, 2003, and May 12, 2004.

Regarding liability under § 1983, the County contends, "Even if Plaintiffs can show a violation of a Constitutional right, Defendant County is not liable." Nemoto and Javier MSJ at 36-37. The County correctly states the standard to be applied under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). Nemoto and Javier MSJ at 36-37. However, as the County does nothing more than mention the Monell requirement, it appears it expects the court to identify the relevant facts of its case and then apply Monell to those facts. The court declines to scour the record or create an argument on the County's behalf. As the County does not meet its burden as movant on issues relating to Monell, summary judgment on that basis is denied. The court therefore turns to other bases advanced by Defendants.

b. Merits of the First Amendment Claims.

i. Protected Speech.

Defendants contend that Nemoto's and Javier's statements are not protected by the First Amendment because they "all relate to [their official job duties to identify errors in the administration and processing of the Section 8 rental program." Nemoto and Javier MSJ at 13, 20. Defendants argue that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate

their communications from employer discipline."  Nemoto and
Javier MSJ at 9 (citing Garcetti v. Ceballos, 126 S. Ct. 1951,
1960 (2006)).  Defendants also argue that Nemoto's and Javier's
speech was either not reported or does not address matters of
legitimate public concern.  Nemoto and Javier MSJ at 18, 23–24.
Alternatively, Defendants posit, "Should this Court find that any
portion of Plaintiffs' speech was not connected to their job
duties, the Court must apply the balancing test set out in
Pickering v. Board of Education, 391 U.S. 563 [(1968)], to make a
final determination as to whether the speech is protected."
Nemoto and Javier MSJ at 25 n.8.

          In Garcetti, 126 S. Ct. at 1955, the Supreme Court
addressed "whether the First Amendment protects a government
employee from discipline based on speech made pursuant to the
employee's official duties."  The Court began by noting that
"public employees do not surrender all their First Amendment
rights by reason of their employment.  Rather, the First
Amendment protects a public employee's right, in certain
circumstances, to speak as a citizen addressing matters of public
concern."  Id. at 1957.  After reviewing its prior cases on the
subject, the Court held that, "when public employees make
statements pursuant to their official duties, the employees are
not speaking as citizens for First Amendment purposes and the
Constitution does not insulate their communications from employer
discipline."  Id. at 1960.

Some of Nemoto's and Javier's speech was taken pursuant to their official work duties. Nemoto said in her deposition that part of her job duties included: (1) reporting errors regarding landlord requests for extension letters; (2) reporting when inspections were completed in an untimely manner; and (3) calculating "errors made by the specialists" that resulted in overpayments by the County to landlords. Ex. 2 (attached to Nemoto and Javier MSJ) at 18–19, 21–22, 30–33. Additionally, Milton Ito, the Section 8 Program Supervisor for the Department, said in a declaration that Nemoto's job duties included "review[ing] documents prepared by the other Housing Specialists, clerks, and inspectors to identify what is incomplete, missing, or in error" and "identif[ying] other errors in the administration of the program." Declaration of Milton T. Ito (9/25/06) ("Ito Decl'n") ¶¶ 1, 15. Because Nemoto does not present any evidence disputing that her job duties included these responsibilities, the court concludes that, under <u>Garcetti</u>, Nemoto's statements related to these job duties are not protected speech.

Defendants argue that Javier's statements "also all related to his duties as a housing inspector." Nemoto and Javier MSJ at 20. However, while showing that Javier's statements may have been incorrect, Defendants point to no evidence establishing that his job duties included making statements on the subject matters addressed.

Additionally, as discussed above with respect to Tongson's claims, speech is protected by the First Amendment only "if it addresses 'a matter of legitimate public concern.'" Coszalter, 320 F.3d at 973.  One of Nemoto's complaints was that the County "does not have written policies to establish who on the staff would have the assignment to schedule appointments for re-inspection and follow-up to verify repairs."  Nemoto admitted that such a policy is a "management issue" concerning "how you are going to get the job done, who is going to do it."  Ex. 2 (attached to Nemoto and Javier MSJ at 24); Nemoto and Javier MSJ at 15.  Regarding Javier's complaint that inspectors are unable to inspect eight units per day on Molokai, Defendants argue, "Whether six, eight or ten inspections are completed on each trip to Molokai is not a matter of public concern."  Nemoto and Javier MSJ at 24.  Nemoto does not show that the complaints in these areas address "matter[s] of legitimate public concern."  The court therefore agrees that they are not protected under the First Amendment.  Coszalter, 320 F.3d at 973.

Defendants also argue that Javier did not report certain violations:

> Plaintiff Javier complained that two units were inspected and passed as favors.  . . . The two inspections occurred in the first half of 2003 and Defendant Javier admits that over the years he has never reported these acts to anyone.  (Javier Depo. at 23:3-27:13).

Nemoto and Javier MSJ at 23.  Although Defendants cite to Javier's deposition testimony, Javier did not admit in the cited

60

passage that he never reported these acts.  Javier says he was instructed to "pass" two units "even though they did not pass the inspection."  Declaration of Jeffrey Javier (10/8/2006) ("Javier Decl'n") ¶ 4(a).  With respect to the first unit, Javier says that he "told Milton all the cover plates was off," even though he did not inform anyone else of the matter.  Ex. 1 (attached to Nemoto and Javier MSJ) at 3.  With respect to the second unit, Javier was asked, "did you report that to anybody, your concerns regarding that inspection?"  Ex. 1 (attached to Nemoto and Javier MSJ) at 7.  Javier responded, "They all knew.  The same people that was there, they all knew what was going on."  Ex. 1 (attached to Nemoto and Javier MSJ) at 7.  Viewing the evidence in the light most favorable to Javier, the court rejects Defendants' assertion that Javier did not report these violations.

There is at least a question of fact as to whether some of Nemoto's and Javier's statements are protected by the First Amendment.  Defendants turn to urging this court to "apply the balancing test set out in Pickering."  Nemoto and Javier MSJ at 25 n.8; Nemoto and Javier Reply at 9-10.  But Defendants provide no analysis and do not apply the Pickering standard to specific facts in this case.  The court declines to create a Pickering analysis for Defendants.

ii.  Adverse Employment Action.

Defendants next argue that Nemoto and Javier's First Amendment claims also fail because they were not subjected to

adverse employment actions.  Nemoto and Javier MSJ at 25-35.
Defendants contend that negative comments are not adverse
employment actions under the First Amendment and that other
actions were taken for legitimate reasons.  The court agrees that
some of Defendants' actions do not constitute adverse employment
actions under the First Amendment.

Defendants assert that, as a matter of law, Defendants'
"[n]egative comments" about Nemoto and Javier do not constitute
adverse employment actions.  Nemoto and Javier MSJ at 28, 33.
Defendants correctly state that "bad-mouthing an employee who
engaged in protective speech is not an adverse employment
action."  Nemoto and Javier MSJ at 28, 33; see Coszalter, 320
F.3d at 976 (noting that "bad-mouth[ing]" does "not constitute an
adverse employment action"); Nunes v. City of Los Angeles, 147
F.3d 867, 875 (9th Cir. 1998) ("All [the plaintiff] has shown is
that he was bad-mouthed and verbally threatened.  It would be the
height of irony, indeed, if mere speech, in response to speech,
could constitute a First Amendment violation.  Thus, Nunez's
First Amendment claim fails.").

Defendants also argue that some of their actions
against Nemoto were taken for legitimate reasons.  In response to
Nemoto's claim that she was not allowed to move to an office on
another floor, Defendants point to the explanation in Ito's
declaration that "Nemoto asked if she could move to another
workspace" "[b]ecause of her conflict with other staff."  Ito
Decl'n ¶ 52.  Ito says, "She was not allowed to move because

space is limited and because all the files that Nemoto would be
working on were kept where she and other specialists were
located."  Ito Decl'n ¶ 52.  Similarly, in response to Nemoto's
claim that she was excluded from meetings, Defendants point to
Ito's statement that Nemoto was excluded from an October 4, 2005,
meeting because "[t]he discussion would not involve specific
compliance issues related to her work."  Ito Decl'n ¶ 54.  Ito
says Nemoto was excluded from other meetings because "the topics
to be covered only involved the work or activities of the
specialists."  Ito Decl'n ¶ 54.  Because Nemoto does not present
any evidence disputing that these actions were taken against
Nemoto for legitimate reasons, the court concludes that these
actions do not constitute adverse employment actions by
Defendants.

Other actions listed by Nemoto and Javier are not as
easily characterized as falling outside the definition of
"adverse employment action."

### iii. Substantial and Motivating Factor.

Defendants next contend that their actions "were not
substantially motivated by Plaintiffs' speech."  Nemoto and
Javier MSJ at 36.  Defendants' entire argument on this issue
states:

> Defendant County has an obligation to
> administer the Section 8 program for the
> benefit of those who are in need of
> rental assistance and who meet the
> qualifications.  Even if any of Plaintiffs'
> speech is protected, the alleged acts of
> retaliation were not substantially motivated

> by the reported speech, but were merely acts
> of supervisors exercising the control
> necessary to administer the program.
> <u>Coszalter v. City of Salem</u>, <u>supra</u>, at 977.

Nemoto and Javier MSJ at 36.  Defendants cite no evidence on this point and do not establish the absence of a genuine issue of material fact as to this matter.  The court is unpersuaded by their mere assertion.

### iv.   Whether Nemoto and Javier Were "Chilled" from Speaking Out.

Defendants argue that, even if Nemoto and Javier engaged in protected speech and suffered adverse employment action, their First Amendment claims fail because "they can both still freely speak out."  Nemoto and Javier MSJ at 30-31; Nemoto and Javier Reply at 1-7.  The court disagrees.

As discussed above with respect to Tongson's First Amendment claims, this court applies an objective standard to determine "whether [Defendants'] acts would chill or silence a person of ordinary firmness from future First Amendment activities."  <u>See</u> <u>Mendocino</u>, 192 F.3d at 1300; <u>cf.</u> <u>Rhodes</u>, 408 F.3d at 568-69; <u>Rayford</u>, 400 F. Supp. 2d at 1230-31.  The court rejects Defendants' argument that Nemoto's and Javier's First Amendment claims fail simply because they were not silenced by Defendants' conduct.

### 3.   Count 2:  Retaliation Under the HWPA.

Defendants argue that they are entitled to summary judgment on Nemoto's and Javier's claims under the HWPA because Nemoto and Javier did not report the alleged violations "for the

purpose of exposing an illegality."  Nemoto and Javier MSJ at 41
(citing <u>Hitchcock</u>, 442 F.3d at 1106 (construing Minnesota's
whistleblower act); <u>Rothmeier</u>, 556 N.W.2d at 593 (construing
Minnesota's whistleblower act).  As discussed above with respect
to Tongson's HWPA claims, the <u>Hitchcock</u> court noted, "To be
protected under the [Minnesota whistleblower act], an employee
must make the report for the purpose of exposing an illegality."
<u>Hitchcock</u>, 442 F.3d at 1106.  Even if this rule of law applies to
claims brought under the HWPA, Defendants do not meet their
burden of showing the absence of a genuine dispute of fact
regarding Nemoto's and Javier's purpose in making their reports.

Defendants also rely on <u>White</u>, 126 S. Ct. at 2415,
which applies to Title VII cases.  Even if <u>White</u> is relevant to
Nemoto's and Javier's HWPA claims, Defendants argue only that
"Plaintiffs have both admitted that they can and do still speak
out."  Nemoto and Javier MSJ at 42.  As discussed above with
respect to Tongson's Title VII claim for retaliation, <u>White</u>, 126
S. Ct. at 2415, sets forth an objective, not subjective, legal
standard.  Defendants do not even argue that their alleged
actions would not dissuade a "reasonable worker from making or
supporting a charge of discrimination."  The court denies summary
judgment on Nemoto's and Javier's claims under the HWPA, but, for
the reasons addressed with respect to Tongson's HWPA claims,
limits their HWPA claims to those that accrued between October
27, 2003, and May 12, 2004.

4.   Count 4:   IIED Claims.

Defendants contend that the IIED claims brought by
Nemoto and Javier fail for lack of evidence that "Defendants'
actions were 'without just cause or excuse.'"  Nemoto and Javier
MSJ at 44.  Defendants assert that they "were simply trying [to]
manage the Section 8 program in an efficient manner and nothing
they did was extreme, outrageous, or beyond the bounds of
decency."  Nemoto and Javier MSJ at 44.  The court grants summary
judgment in favor of the County and Lee officially, but denies
summary judgment with respect to Lee in her individual capacity.

As discussed above, Hawaii's workers' compensation
scheme bars a civil action against an employer for emotional
damages resulting from work-related injuries and accidents,
unless it relates to sexual harassment or violations of Haw. Rev.
Stat. § 378-2.  See Haw. Rev. Stat. § 386-5; Luzon, 284 F. Supp.
2d at 1263; Nelson, 97 Haw. at 393, 38 P.3d at 112; Takaki, 87
Haw. at 59, 951 P.2d at 509.  None of Nemoto's or Javier's IIED
claims relates to sexual harassment or is based on Haw. Rev.
Stat. § 378-2.  The County was their employer, and their claims
against Lee in her official capacity are claims against the
County itself.  The court therefore grants summary judgment on
the IIED claims in favor of the County and Lee in her official
capacity pursuant to Haw. Rev. Stat. § 386-5.

Regarding the IIED claims against Lee individually, Lee
points the court to no undisputed evidence as to her intent.
Nemoto and Javier have claims remaining before this court, and

the court cannot say that there is no question of fact as to whether, if Nemoto and Javier prevail on the remaining claims, Lee's alleged actions were intentional and outrageous.  The court therefore denies summary judgment as to the IIED claims against Lee in her individual capacity.

        C.    <u>Punitive Damages.</u>

        Defendants argue in both of their motions that "[p]unitive damages may not be obtained against the County or employees in their official capacities" and that, "[i]n order to obtain punitive damages against [the individual Defendants], [Plaintiffs] must prove 'reckless or callous disregard.'" Tongson MSJ at 36; Nemoto and Javier MSJ at 46-48.  The court grants summary judgment in favor of the County and the official Defendants.

        In <u>Lauer v. Young Men's Christian Association of Honolulu</u>, 57 Haw. 390, 402, 557 P.2d 1334, 1342 (1976), the Hawaii Supreme Court held that the City and County of Honolulu is not liable for punitive damages:

> Public policy dictates the conclusion that the City, as a municipal corporation, should not be held liable for punitive damages.  The innocent taxpayers, the intended beneficiary from the public example which the punishment makes of the wrongdoer, should not be made to suffer.  The deterrent or retributive effect of punitive damages must be placed squarely on the shoulders of the wrongdoer.

<u>Id.</u>; <u>see also</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981) ("we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983").  Because a suit

against a governmental officer in his official capacity is a suit against the governmental entity itself, the official Defendants are similarly immune from punitive damages.  Cf. Mitchell, 75 F.3d at 527; Lauer, 57 Haw. at 402, 557 P.2d at 1342.

With respect to Plaintiffs' claims against the individual Defendants, punitive damages may be awarded

> where the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations; or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

Masaki v. Gen. Motors Corp., 71 Haw. 1, 11 780 P.2d 566, 572 (Haw. 1989).  Defendants present no argument or evidence in support of their assertion that punitive damages are improper against Lee or Stebbins.  The court therefore denies summary judgment on Plaintiffs' claim for punitive damages against the individual Defendants.

V.        CONCLUSION.

In light of the foregoing, the court grants in part and denies in part Defendants' motions for summary judgment.  This order leaves the following claims for future adjudication: (1) certain retaliation claims by Tongson, Nemoto, and Javier against the County, and by Nemoto and Javier against Lee in her official capacity, under § 1983 based on the First Amendment and under the HWPA; (2) certain IIED claims by Tongson against the County, IIED claims by Tongson, Nemoto, and Javier against Lee in her individual capacity, and IIED claims by Tongson against

68

Stebbins in her individual capacity; (3) Tongson's claim against the County for breach of implied contract; and (4) punitive damage claims against the individual Defendants.

        IT IS SO ORDERED.

        DATED:  Honolulu, Hawaii, December 15, 2006.



        Susan Oki Mollway
        United States District Judge

**Tongson, et al. v. County of Maui, et al.**, Civ. No. 05-00683 SOM/LEK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.